**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS F. MARTINEK, ROBERT HEBEL, JR., individually and derivatively on behalf of POLITICO, LLC, and MAS VERDE, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Joan B. Gottschall |
| ROSENDO DIAZ, ROSENDO DIAZ d/b/a VINI'S PIZZA OF PALATINE, HV-A-SLICE, INC., d/b/a VINI'S OF PALATINE, VINI'S PIZZA OF UPTOWN, LLC, BRYAN MATSUI, EDDIE SANTIAGO, VINI'S PIZZA OF BARTLETT, LLC, JOHN H. REDFIELD, ESQ., MARY JO LAROCCO, and JOHN AND JANE DOES, | ) ) ) ) ) ) ) ) ) ) | Case No. 11 C 7190 |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION & ORDER**</u>

The plaintiffs in this action have filed a sixty-eight-page complaint alleging some nineteen different causes of action against various defendants,[1] including *inter alia* fraud, conversion, theft, embezzlement, breach of fiduciary duty, tortious interference, civil conspiracy, malpractice, violations of the Illinois Securities Act, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The court is now faced with three motions to dismiss: one filed by Rosendo Diaz and Mary Jo Larocco; one filed by Hv-A-Slce, Inc., Vini's Pizza of Uptown, LLC, Vini's Pizza of Bartlett, LLC, Eddie Santiago, and Bryan Matsui; and one filed by John Redfield. Because the court concludes

---

[1] The plaintiffs originally named First Data Corporation ("First Data") as an additional defendant, but voluntarily dismissed all claims against First Data with prejudice on December 2, 2011.

that the plaintiffs have failed to state a RICO claim, the court grants the motions and dismisses the complaint without prejudice.

## I. BACKGROUND

The plaintiffs claim that the conspiracy alleged in the complaint actually started long before they got involved. According to the plaintiffs, in 2003, Defendant Rosendo Diaz and Dion Romano were both 50% shareholders in D.R. Crew, Inc., which owned and operated a pizza shop called Vini's Pizza in Palatine. In August of 2003, Romano agreed to transfer and sell his interest in that Vini's Pizza to Diaz for $250,000. Diaz continued to own and operate the Vini's Pizza, but according to the plaintiffs, Diaz— together with Eddie Santiago, Bryan Matsui, and Diaz's attorney John Redfield— "devised a plan and entered into a conspiracy" to hide Diaz's interest in the business. They did so by incorporating a new business, Hv-A-Slce, Inc. ("Hv-A-Slce"),[2] that was registered to do business as "Vini's of Palatine." Matsui was the president of Hv-A-Slce, while Diaz was the owner. Under an October 2004 agreement, Diaz supposedly sold 200 shares in the new corporation to Santiago and Matsui for $100,000; he also purported to give up his proprietary interest and managerial control, although Diaz retained the exclusive right to obtain 800 shares at no cost at any time. No money transferred hands, and eight months later Diaz filed for Chapter 13 bankruptcy. In the bankruptcy proceedings, Diaz and Redfield intentionally failed to disclose Diaz's purchase of the business from Romano, the stock sale he purported to make to Matsui and Santiago, and the $100,000 purchase price. Diaz also misrepresented his income and assets, his employer's name, and his real property holdings. The plaintiffs allege that Diaz, Matsui,

---

[2]        Sometimes the defendant's name is spelled "Hv-A-Slice," but the court will use the name given in the caption of the complaint.

and Santiago embezzled money from Vini's of Palatine; that Diaz only sporadically paid Romano the money he owed and gave Romano false financial statements; that Diaz, Matsui, Santiago, and Hv-A-Slce falsely reported income on tax returns; and that Hv-A-Slce employed undocumented aliens. (*See* Compl. ¶¶ 12-20.)

But none of this has to do with the plaintiffs in this case. They did not get involved with Diaz until 2008. In February or March of that year, Diaz proposed to plaintiff Dennis Martinek that Diaz and Martinek should join together to start a Vini's Pizza in the Lincoln Park neighborhood of Chicago. Diaz told Martinek that Vini's Pizza in Palatine was netting over $1 million per year, and sent a summary and projections for the Lincoln Park business to Martinek via mail. (*See* Compl. Ex. A.) The plaintiffs allege that this information was known to be false, and was provided with the intent to induce Martinek to invest with Diaz. In any event, Martinek and Diaz agreed that Martinek would provide start-up capital of about $253,000; that Martinek and Diaz would each receive 2000 common shares based on an initial capital contribution of $20,000 each; and that instead of receiving a $6000 per month salary for managing the business, Diaz's salary would be used as a capital contribution. Diaz told Martinek that Redfield would form a new company for them called Politico, LLC ("Politico") for $1000—but in truth Politico had already been formed prior to Martinek's involvement, with Diaz as its manager and sole officer. Martinek, without counsel to represent him, executed the agreement forming the LLC ("the Politico LLC Agreement"). Under the Politico LLC Agreement, Martinek was simply a passive investor.

Diaz found a location for the business in Lincoln Park, and entered into a five-year lease in May 2008. Martinek then made capital contributions and provided money

for start-up costs to Politico's bank account, which by September of that year totaled $329,000. Diaz never made any capital contributions to Politico, but withdrew over $318,537 from Politico's bank account. Diaz told Martinek that he was paying cash for items to save money, and refused to provide detailed bills and receipts when pressed. The amounts Diaz purported to pay for equipment and build-out were grossly inflated; although Diaz and Matsui compiled figures showing the equipment costs were $161,126.00 and that the improvements made to the store totaled $178,290.00, in fact neither of these expenses should have exceeded $50,000. Diaz made these same misrepresentations to the Internal Revenue Service.

Vini's Pizza of Lincoln Park opened in late October 2008. In managing the business, Diaz used a point-of-sale system called "Revention POS." This system was not a comprehensive accounting system, and allowed for entries to be manually entered, removed, or canceled. A comparison between the Revention records and Politico's bank records show that a substantial amount of cash and check sales proceeds were never deposited into Politico's bank account. Diaz represented to Martinek that the Lincoln Park pizza shop was not making enough money to meet its obligations, and requested additional funds. Martinek asked Robert Hebel, Jr. for help. Hebel contributed $163,660 to the business in consideration for receiving shares in Politico as set forth in the Politico LLC Agreement. Martinek and Hebel also made payments to various creditors of Politico, including rent payments and late fees paid directly to restaurant's landlord. In the meantime, Diaz was issuing checks from the Politico account to himself and to Mary Jo Larocco (the woman with whom Diaz lived at the time). In addition to simply not

depositing the proceeds of sales, Diaz or Santiago would at times instruct customers to send payment directly to other, non-Vini's of Lincoln Park addresses.

The only distribution Martinek ever received from the Vini's Pizza business was in February 2009. In order to hide Politico's income from Martinek and Hebel, Diaz, Matsui and Santiago diverted the proceeds to other bank accounts, including accounts for Hv-A-Slce, Inc.; Diaz, Santiago, or Matsui's personal accounts; and accounts for other Vini's Pizza locations. Diaz also secretly opened up additional Politico or personal bank accounts into which he deposited some sales proceeds. Diaz used these accounts to pay personal expenses, as well as to open and operate other Vini's restaurants (including Vini's Pizza of Uptown, LLC and Vini's Pizza of Bartlett, LLC, both of which purported to be owned by Santiago or Santiago's mother). Diaz, Matsui, and Santiago would arrange for employees to take supplies belonging to Vini's of Lincoln Park to other Vini's locations, without reimbursing the Lincoln Park location for costs. Diaz also wrote checks to various Politico employees, but failed to withhold the amounts owed for federal and state taxes, Social Security, Medicare, and unemployment, although those amounts were deduced from employee paychecks. Diaz, Matsui and Santiago did not pay the full amounts owed to the federal and state government, nor did they file appropriate W2 forms for their employees. Diaz also lied on Politico's tax returns, stating that Politico had not paid its officers any compensation, nor had it paid salaries or wages to employees. Diaz told Hebel and Martinek that he maximized profits by hiring undocumented aliens, particularly those from Mexico, and paid them in cash. When Hebel and Martinek objected, Diaz ultimately told them he had stopped the practice as of February 2009.

Vini's Pizza of Lincoln Park incurred significant overdraft charges as a result of Diaz's practice of writing bad checks. In May 2009, Hebel insisted that Politico open a new bank account, one which Hebel would be able to link to his private account so as to avoid future overdraft fees. Diaz somehow managed to open yet another bank account that was linked to the new Politico account, and continued to transfer money from the Politico account to his personal account.

The plaintiffs claim that Diaz et al.'s diversions of funds continued until August 2010. On or about August 4, 2010, Diaz telephoned Martinek and told Martinek that he was closing the business that day because it had never made any money. Based on the assurances Martinek had heard from Diaz, Martinek was "shocked and surprised." When Martinek went to the Lincoln Park store, employees told him that they lacked the food and supplies needed to make pizzas for customers, and that Diaz was at a new Vini's Pizza location located on Lawrence Avenue in Chicago's Uptown neighborhood. Martinek had no idea Diaz had opened a new store, and he later learned that Diaz had taken equipment and supplies from the Lincoln Park location to the Uptown location.

At this point, Martinek decided to take action. On August 5, 2010, Martinek arranged to reopen the Lincoln Park location: he changed the locks, contacted some employees, bought food supplies, and opened for business. Martinek began to unravel the outstanding liabilities and issues left in Diaz's wake, and decided to form a new corporation, Mas Verde, Inc. ("Mas Verde"), to operate Vini's Pizza of Lincoln Park. Mas Verde initially could not complete its registration with the State of Illinois due to Politico's unpaid taxes. The State demanded that Martinek pay the taxes, and Martinek requested a hearing. As part of that proceeding, Martinek moved to subpoena Diaz's bank

records, but Redfield moved to quash the subpoena after Diaz paid the outstanding state taxes. Because Diaz's payment mooted the issue in the eyes of the State, the motion to quash was granted.

Martinek learned that Diaz had informed many of their larger customers that Diaz's new pizza shop, Vini's Pizza of Uptown, would beat any price proposed by Vini's Pizza of Lincoln Park. Still, Mas Verde did fairly well its first week in business as Vini's of Lincoln Park, making over $7500 in sales. First Data was to process the credit card sales, but First Data mistakenly processed certain sales via Politico's merchant account instead of Mas Verde's account, which resulted in the proceeds being deposited into a non-Politico bank account owned by Diaz. Martinek asked Diaz to return the funds, as well as any other Politico property or funds Diaz still had in his possession. Diaz refused. Martinek also requested that Redfield turn over any of Politico's books or records, and that Redfield cease acting as counsel for Politico or Vini's Pizza of Lincoln Park due to the conflict of interest that had arisen. Redfield refused.

Although Mas Verde was beginning to break even by about May 2011, an unexpected increase in the property tax portion of Mas Verde's lease payment forced Mas Verde to have to close Vini's Pizza of Lincoln Park. Martinek has been sued by the landlord for about $100,000 in unpaid rent, including rent that should have been paid while Diaz was managing the Lincoln Park store. The parties met after the dissolution of the business to discuss settlement, but Diaz dropped out of the negotiations, which prompted the plaintiffs to file the instant suit.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the defendant may seek to dismiss the case if the plaintiff "fail[s] to state a claim upon which relief can be granted." The court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 438 (7th Cir. 2010). But although Federal Rule of Civil Procedure 8(a) requires only that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," nonetheless the complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 566 U.S. 662 (2009) (noting that while Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). The relevant question is whether the complaint includes enough factual allegations to "raise a right to relief above the speculative level." *Id.* In other words, to survive a motion to dismiss post-*Twombly*, "'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together,' and the question the court should ask is '*could* these things have happened, not *did* they happen.'" *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010)).

In addition, any fraud-based allegations, such as allegations of fraud in a civil RICO complaint, must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) ("Rule 9(b) is

of course applicable to allegations of fraud in a civil RICO complaint."). This means the plaintiff must, at a minimum, provide the time, place, and content of the alleged false representations, the method by which the representations were communicated, and the identities of the parties to those representations. *Slaney*, 244 F.3d at 597.

### III. ANALYSIS

In this case, federal jurisdiction is predicated on the viability of the plaintiffs' RICO claims. The plaintiffs state that the defendants (except for Larocco) committed mail fraud and wire fraud, unlawfully employed aliens, engaged in money laundering, and transacted in property derived from illegal activity. Together, the plaintiffs allege these acts violated 18 U.S.C. §§ 1962(a)-(d)—in other words, all four of the prohibited activities set out in the RICO statute. 18 U.S.C. § 1962 reads, in relevant part, as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

While each subsection of the statute targets different behavior, they share at least two things in common: the plaintiffs must establish both the existence of an "enterprise" and a "pattern of racketeering activity." The court turns to the "enterprise" requirement first.

## A. Enterprise

"[A] RICO complaint must identify the enterprise," *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (internal quotation marks and citation omitted), and the enterprise can include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," *see* 18 U.S.C. § 1961(4). Here, the plaintiffs have identified what they call the "Diaz Enterprise," which they allege consists primarily of Diaz, Matsui, and Santiago and their pizza businesses (Hv-A-Slce, Vini's Pizza of Palatine, Vini's Pizza of Bartlett, and Vini's Pizza of Uptown). The plaintiffs further allege that the Diaz Enterprise is "assisted by" Redfield, Santiago's mother, and various John and Jane Does.

As the plaintiffs have not alleged that the Diaz Enterprise has status as a legal entity, they must instead intend to proceed under the "association-in-fact" enterprise theory. *See Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) (describing enterprises as being of two types: "legal entities and extra-legal 'associations in fact'"). Yet the complaint as drafted provides none of the requisite facts to establish an association in fact. In attempting to load the complaint with reference to as much documentary evidence as possible, the plaintiffs have lost sight of the point of Rule 8—that the plaintiff provide a "short and plain statement of the claim" that suffices to put the defendant on notice of the claims against him. Intentionally or not, the complaint obfuscates the precise nature of the RICO claims at issue. Despite being 68 pages long, the complaint simply provides

a blanket allegation that all of the defendants (save Larocco) participated in all of the prohibited activities set out 18 U.S.C. §§ 1962(a)-(d) by committing various predicate acts. Although each subsection of § 1962 requires different proof, the plaintiffs do not attempt to establish specifically how each individual subsection was violated, nor do they set out each defendant's respective role in the alleged enterprise.

Under an association-in-fact theory, the "enterprise" and the person(s) sought to be held liable must be sufficiently distinct. *See Crichton*, 576 F.3d at 398. Here, the plaintiffs have not defined the enterprise sufficiently for this court to determine whether this is so. In addition, the plaintiffs have not set out any type of organizational structure or hierarchy. The enterprise must be defined "by what it is, not what it does." *Jennings*, 910 F.2d at 1440; *see Slaney*, 244 F.3d at 600 n.11. Although the plaintiffs provide some minimum detail with respect to Diaz, Matsui and Santiago's positions within some of the pizza businesses, the plaintiffs do not provide any structure for the enterprise itself. Thus, the plaintiffs have failed to state a RICO claim. *See Crichton*, 576 F.3d at 400 ("[The plaintiff] failed to adequately plead an association-in-fact enterprise because he has not pleaded an organizational structure or hierarchy for the alleged association-in-fact enterprise."); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675-77 (7th Cir. 2000) ("A RICO enterprise must have an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchial or consensual decision making.") (internal quotation marks and citation omitted).

## B. Pattern of Racketeering Activity

A "pattern" of racketeering activity exists when at least two predicate acts of racketeering, which are enumerated in 18 U.S.C. § 1961(1), occur within a ten-year

period. *See* 18 U.S.C. § 1961(5); *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011). Although the plaintiffs have stated that the defendants committed more than two of the statutorily enumerated specific acts within a ten-year period, such allegations alone do not suffice. *See Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 387 (7th Cir. 1984) ("[T]o state a claim under RICO, a civil plaintiff must allege more than the occurrence of two predicate acts of racketeering from the list in section 1961."). The RICO statute "was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions." *Jennings v. Auto Meter Prods., Inc.* ("*Auto Meter*"), 495 F.3d 466, 472-73 (7th Cir. 2007) (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)). Instead, RICO "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). But the siren call of the treble damages and attorney's fees often proves too tempting to withstand, and the courts continue to face "widespread attempts to turn routine commercial disputes into civil RICO actions." *Auto Meter*, 495 F.3d at 472-73 (quoting *Midwest Grinding Co.*, 976 F.2d at 1022).

To rebuff such attempts, "courts carefully scrutinize the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity." *Id.* To satisfy the pattern requirement, a plaintiff must meet the "continuity plus relationship" test: "the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Id.*; *see DeGuelle*, 664 F.3d at 201 n.4 ("We acknowledge that there is a danger . . . that plaintiffs will bring claims which should be handled by state law . . . into federal court under the guise of RICO. But we are

confident the continuity requirement will often weed out those claims which do not truly demonstrate a threat of continued wrongdoing.") (citation omitted).

"Satisfying the pattern requirements—that there be continuity and relationship among the predicate acts—is not easy in practice." *J.D. Marshall Int'l., Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991). A relationship between the predicate acts exists where the acts "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *DeGuelle*, 664 F.3d at 199 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). As to the continuity prong, either "closed-ended" or "open-ended" continuity will suffice. "Closed-ended continuity refers to criminal behavior that has ended but the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future," whereas "open-ended continuity requires a showing of past conduct that by its nature projects into the future with a threat of repetition." *Id.* (internal quotation marks and citation omitted).

Here, the plaintiffs allege that in February 2008, Diaz, Matsui and Santiago devised a plan to defraud Martinek, Hebel, Politico, and Mas Verde, as well as the United States, the State of Illinois and the City of Chicago. The plaintiffs identify three categories of predicate acts[3] which they believe establish a "pattern of racketeering activity": mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, unlawful employment of aliens in violation of 18 U.S.C. § 1324a, and money laundering/transacting with illegal property in violation of 18 U.S.C. §§ 1956 and 1957. To support their allegations of mail and wire fraud, the plaintiffs point to the defendants'

---

[3]     Although certain of the defendants complain that the plaintiffs only allege predicate acts of mail and wire fraud, this is simply not true. (*See* Hv-A-Slce et al. Mem. in Supp. of Mot. to Dismiss at 6.)

representations as to (1) the cost of the equipment and renovations to the rental space, (2) operating income and expenditures, (3) financial and accounting data, and (4) the amount of withholdings and wages paid to employees, all of which were made to convince Martinek and Hebel to invest money or to cover up the conspiracy. To support their allegations relating to unauthorized employment of aliens, the plaintiffs claim that the defendants (1) intentionally recruited and hired unauthorized aliens, (2) failed to record or verify Social Security numbers for employees, and (3) issued checks to individuals not recorded as employees, which made issuing W2's for these people impossible, as part of a conspiracy to defraud the United States and the State of Illinois and to hide or steal income produced by Politico and the other Vini's Pizzas.[4] Finally, to support their allegations of money laundering and transacting with illegal property, the plaintiffs allege that the defendants deposited, withdrew, transferred or exchanged the proceeds of their illegal activities from various financial institutions with the intent of carrying out additional illegal activities, to conceal the nature, location, source, ownership or control of the proceeds, and to avoid any reporting requirements.

1. Relationship

A "relationship" between predicate acts exists where the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240. The defendants argue that the plaintiffs failed to allege a relationship between the various acts of mail and wire fraud, and also failed to allege any relationship between the mail/wire fraud allegations and those relating to illegal aliens or money

---

[4] As some of the other Vini's Pizza restaurants are named as defendants and as participants in the Diaz Enterprise, this allegation seems at odds with the rest of the complaint.

laundering. (*See* Diaz & Larocco Mem. in Supp. of Mot. to Dismiss at 7.) The plaintiffs muddy the waters by spending significant time detailing Diaz's alleged scheme from 2003-2005 to defraud Romano (the original co-owner of the Vini's Pizza of Palatine). But despite dedicating ten pages of facts to this history, the plaintiffs have not described any of the criminal acts that allegedly took place during this time as being "predicate acts" for purposes of the RICO charges. (*See* Compl. ¶¶ 62-72.) They certainly could have done so: "[A] plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1004 (7th Cir. 2004).

But even if they had alleged that these were predicate RICO acts, they have not sufficiently pleaded a relationship between these earlier acts and the later acts involving Martinek et al. In fact, the plaintiffs describe the scheme to defraud Romano as being separate from the scheme(s) involving the plaintiffs. According to the plaintiffs, the purpose of the Romano scheme was "to hide Diaz's interest in, income from, and involvement with [the Palatine business]" from the tax and bankruptcy authorities. (*Id.* ¶ 13.) By contrast, the primary purpose of the scheme(s) involving the plaintiffs was to defraud Martinek and Hebel. In addition, the schemes involve different victims, and the way in which these schemes were accomplished is not so similar that the court can conclude they are "not isolated events." For instance, in attempting to hide Diaz's ownership in the Palatine business, Diaz, Matsui, and Santiago allegedly formed an entirely new corporation and Diaz transferred his entire interest in the new business, Hv-A-Slce, to Matsui and Santiago. But there is no similar allegation in the scheme(s) involving Martinek—there, Diaz and Martinek executed an agreement that jointly created

Politico, and Diaz maintained an ownership interest in the business (albeit without making the requisite capital contributions). Diaz did not attempt to hide his involvement with Politico or Vini's Pizza of Lincoln Park. The court concludes that the plaintiffs have not established a relationship between the acts alleged in 2003-2005 and the later acts involving Vini's Pizza of Lincoln Park.

The other issue is whether the acts actually alleged as predicate acts in the complaint, *i.e.*, those acts revolving around the Vini's Pizza of Lincoln Park, share the requisite relationship. The court is not clear on how many different schemes are at issue—at times the plaintiffs seem to treat these acts as being part of a single, large scheme to defraud Martinek and Hebel and to avoid detection, whereas at other times the plaintiffs seem to treat as separate schemes the attempts to (1) defraud Martinek and Hebel into making initial capital contributions, (2) to divert sales proceeds from Vini's Pizza of Lincoln Park's catering contracts, (3) to generally hide Politico's proceeds from Martinek and Hebel, and (4) to commit tax fraud. Regardless, the court believes the mail and wire fraud predicate acts are sufficiently related for RICO purposes.

First, the mail and wire fraud took place over a relatively short period of time, from 2008 to 2011, and were perpetrated by a stable group of participants against the same victims. While the purposes of each individual scheme might vary, overall the plaintiffs have alleged that the acts were undertaken for the purpose of defrauding the plaintiffs and avoiding detection by the relevant authorities. Although it is not a slam dunk, the plaintiffs have alleged sufficient facts to satisfy the relationship element of the pattern requirement at this stage in the proceedings, at least for the mail and tax fraud allegations. *See J.D. Marshall Int'l.*, 935 F.2d at 820 ("[The plaintiff's] allegations of

mail and wire fraud by [defendants] all involve the same type of misconduct—defrauding [the plaintiff] of its proceeds—all occur within a relatively short period of time—thirteen months—and are all related by a common purpose—the desire to recoup what [the plaintiff] purportedly owed."); *see also Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1338 (7th Cir. 1997) (describing a pattern of racketeering activity consisting of "innumerable mail and wire frauds successfully designed to lure [the plaintiff] into investing more and more of its money in [a business], much of which went into [the defendant's] pocket"). And because the money laundering/transacting in illegal property predicate acts are basically certain acts of mail or wire fraud restated in a different fashion, these acts would also satisfy the "relationship" prong of the test.

This is not true, however, with respect to the unlawful employment of aliens. The court has little useful information by which to proceed—for instance, the court has not been provided with any indication that anyone other than Diaz was involved in the decision to employ such persons, nor does the court have any idea how many such persons were allegedly employed. (Although the plaintiffs state that 63 employees did not have their Social Security numbers recorded, this does not necessarily mean that these people were unlawfully employed aliens.) And if anything, the time frame over which the aliens were employed indicates that this predicate act is not related to the other acts: Diaz began paying employees by check and represented that he had stopped any such practice by February 2009. (*See* Compl. ¶ 44.) Although the plaintiffs claim that the Diaz Enterprise has continued to employ illegal aliens in the other Vini's Pizza businesses, this can have no bearing on a scheme to defraud Martinek and Hebel. Consequently, the court

concludes that the unlawful employment of aliens does not share a relationship with the other predicate acts alleged in the complaint.

2. Continuity

Some defendants argue that at best, the allegations relate to a "one-off event" that fails to satisfy the "continuity" requirement. (*See* Hv-A-Slce et al. Mem. in Supp. of Mot. to Dismiss at 4-5; Redfield Mem. in Supp. at 5.)[5] The court agrees.

Although the relationship prong and the continuity prong are analytically distinct, their proof often overlaps. *See Corley*, 388 F.3d at 1002. The continuity requirement can be satisfied by showing "closed-ended continuity," *i.e.*, criminal behavior that has ended but carries the implicit threat of continued activity in the future. To establish this type of continuity, a plaintiff may prove "a series of related predicates extending over a substantial period of time." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 672-73 (7th Cir. 2005). Alternatively, the continuity requirement can be satisfied by showing "open-ended continuity," *i.e.*, past conduct that—although it lacks the duration and repetition to establish continuity—by its very nature threatens repetition in the future. *Id.* To evaluate whether the plaintiffs have satisfied the continuity requirement, the court considers "(1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries." *Id.* No single factor is dispositive; instead, the court must look at the specific facts of the case "with the goal of achieving a 'natural and commonsense' result, consistent with Congress's concern with long-term criminal conduct." *Id.* at 673 (citations omitted).

---

[5]     Curiously, other defendants choose to forego this issue entirely. (*See* Diaz & Larocco Reply at 6.)

There are a few guiding principles that are particularly applicable to this case. First, "even a period of several years may not qualify as substantial enough to satisfy the continuity requirement." *Id.* Here, the predicate acts could not have spanned more than a few years, and the vast majority fell within the relatively short time frame from February 2008 to August 2010, when Diaz informed Martinek that he was closing the business. This weighs against a finding that the plaintiffs satisfied the continuity requirement.

Second, "[a] fairly small number of predicate acts cuts against showing continuity, particularly when a large proportion of the acts involved wire or mail fraud, neither of which are favored means of establishing a RICO pattern in this circuit." *Id.* at 673; *see Auto Meter*, 495 F.3d at 475. Here, the court has no idea how many individual incidents of mail or wire fraud are alleged, because the plaintiffs have lumped many of these allegations together into broad groups. But there can be no question that the vast majority of predicate acts alleged in this case involve wire or mail fraud. And as the defendants have pointed out, the plaintiffs' allegations of money laundering or transacting with illegal property pursuant to 18 U.S.C. §§ 1956 and 1957 are basically just restatements of certain of the mail and wire fraud charges. *See Auto Meter*, 495 F.3d at 475 (discussing a plaintiff's failed attempt to demonstrate a wide variety of predicate acts by alleging that individual acts violated multiple statutes, *e.g.*, treating the act of mailing false information to constitute tampering with evidence). So even if these predicate acts together comprise a large number of criminal violations, "just because the complexity of the transaction creates the potential for a greater number of possible fraudulent acts does not mean that there is the requisite threat of continued criminal

activity." *See Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 523 (7th Cir. 1995).

Third, the number of victims is relatively small. While "the existence of a single victim does not preclude the existence of a pattern of racketeering activity," *id.* at 523, the small number of victims remains relevant. On the other hand, the court is not equipped to determine whether the plaintiffs are alleging separate schemes, and the court will presume that the plaintiffs suffered a number of distinct injuries. But at the end of the day, the court's job is to achieve "a 'natural and commonsense' result, consistent with Congress's concern with long-term criminal conduct." *Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 673. After analyzing the factors, and after stepping back to look at the facts of the case as a whole, the court concludes that the plaintiffs have not established the requisite continuity to state a RICO claim. The allegations in the complaint describe a "routine commercial dispute," *Auto Meter*, 495 F.3d at 472-73, not the "organized, long-term, habitual criminal activity" that is the hallmark of RICO. *See Gamboa*, 457 F.3d at 705.

## C. Rule 9(b)

Even if the court was to conclude that the plaintiffs properly pleaded both the existence of an "enterprise" and a "pattern of racketeering activity," the court would nonetheless dismiss the complaint. As noted above, Rule 9(b)'s particularized pleading requirements apply to allegations of fraud in a civil RICO complaint. *See Goren*, 156 F.3d at 726. Thus, for each fraudulent act, a RICO plaintiff "must, at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Midwest Grinding*, 976

F.2d at 1020; *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (noting that the particularity requirement requires "the who, what, when, where, and how"). Moreover, when a plaintiff is alleging that multiple defendants took part in the fraud, "Rule 9(b) requires a RICO plaintiff to plead sufficient facts to notify each defendant of his alleged participation in the scheme." *See Goren*, 156 F.3d at 726 (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)).

The plaintiffs have not satisfied the Rule 9(b) standard on either front. First, although some of the allegedly fraudulent acts may have been described with the requisite particularity in the background factual section, the plaintiffs never make it clear precisely which acts they rely upon as being predicate acts. In other words, instead of pointing to a specific act of mail fraud as a predicate act, they simply group the mail and wire fraud together into broad categories such as "provid[ing] false operating income and expenditure information." (*See* Compl. ¶ 64.) The court cannot glean how many (or which) such instances are at issue, which means the court cannot discern which of the defendants was involved in each communication, whether each communication is alleged to have violated the wire fraud statute or the mail fraud statutes (or both), the date on which each communication took place, or how each communication was transmitted.

Second, the plaintiffs have stated only that the "Diaz Enterprise" committed all of the prohibited activities set out in the RICO statute. The defendants are not provided with information regarding each defendant's individual participation in the scheme(s). In fact, given the way the complaint is pleaded, the defendants cannot even tell whether they are alleged to have violated each of §§ 1962(a)-(d). And since § 1962(d) deals with those who conspire to violate the provisions of § 1962(a)-(c), the plaintiffs could be asserting

not only violations of subsection (a), (b), and (c) against each defendant, but also that each defendant conspired to violate each subsection. The court, and each defendant, has no way of telling. The complaint does not meet the particularized pleading standard set out in Rule 9(b).[6]

## D. Private Securities Litigation Reform Act

Were the problems with the plaintiffs' complaint limited to what the court has already discussed, the court would dismiss the RICO claims without prejudice and permit the plaintiffs leave to amend their complaint. However, the last issue that the court must consider renders any amendment to the RICO claims futile.

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, a person attempting to establish liability under the RICO statute cannot "rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c); *see Moorehead v. Deutsche Bank AG*, No. 11 C 0106, 2011 WL 4496221, at *11 (N.D. Ill. Sept. 26, 2011). Defendants Diaz and Larocco argue that the plaintiffs are attempting to do just that, as evidenced by the fact the plaintiffs allege securities fraud under 815 Ill. Comp. Stat. 5/12.[7] Thus, the defendants argue that the RICO claims must be dismissed based on this so-called "RICO bar." The plaintiffs respond that the RICO bar only applies where the fraudulent representations relate to the *value* of the securities being purchased, and that here "the fraud was not representations concerning the value of

---

[6]     The complaint may not even satisfy Rule 8. For instance, to establish a violation of § 1962(c) for each defendant, the plaintiffs must show that that defendant "participate[d] in the operation or management of the enterprise itself." *Crichton*, 576 F.3d at 399 (citations omitted). By failing to describe each defendant's involvement, the plaintiffs have not even alleged a plausible violation of § 1962(c).

[7]     The complaint appears to contain a typographical error, as it alleges a violation of 515 Ill. Comp. Stat. 5/12, which does not exist. Chapter 515 of the Illinois Compiled Statutes addresses issues relating to fish.

the securities that would be issued, but rather the conduct of the business, the theft, looting, embezzlements, and other wrongful activities in the way the Diaz Enterprise Defendants operated their businesses to rob the corporation of its income and kill the business." (Combined Resp. at 17.)

The plaintiffs' position ignores the specifics of their complaint. In Count XII, the plaintiffs allege that the shares in Politico that were purchased by Martinek and Hebel were securities, and that Diaz engaged in "fraud in the sale of securities" by

> F. [Engaging in a] transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
>
> G. [Obtaining] money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[, and]
>
> ****
> I. [Employing] any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

*See* 815 Ill. Comp. Stat. 5/12. In other words, the plaintiffs' allegations specifically relate at least in part to misrepresentations Diaz made in selling securities to Martinek and Hebel. The plaintiffs' attempt to avoid the RICO bar simply by not stating a claim for federal securities fraud is unavailing. *See Moorehead*, 2011 WL 4496221, at *12 ("A number of courts have found the PSLRA to bar RICO claims regarding similar or identical tax-reducing investment strategies even without the specific allegations regarding securities."); *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading.").

The plaintiffs' view that the misrepresentations at issue must concern the value of the securities is too narrow. Although the Seventh Circuit does not appear to have had occasion to speak on scope of the RICO bar, the Ninth Circuit's approach is informative: it interprets the requirement that the fraud be committed "in connection with" a securities transaction to mean that "a certain relationship [must] be established between the fraud and the transaction that resulted in the injury complained of." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871-72 (9th Cir. 2010) (citations omitted). The court therefore must "carefully examine the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that operated as a fraud on sellers or purchasers of securities." *See Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545, at *6 (N.D. Ill. Oct. 8, 2004). This ensures that the alleged fraud is of the type the securities laws were intended to remedy. *Rezner*, 630 F.3d at 871-72.

Here, the plaintiffs have alleged that the Diaz Enterprise intended to deceive and defraud the plaintiffs from the very beginning, before Martinek even signed off on the Politico LLC Agreement. As a result of fraudulent misrepresentations, both Martinek and Hebel agreed to purchase securities in Politico. The court must conclude that a number of the wire and mail fraud acts alleged were part of a scheme that operated as a fraud on Martinek and Hebel, who by their own admission were purchasers of securities. As a result, the PSLRA bars the plaintiffs' RICO claims. The court will not permit amendment, as any amendment to the complaint would be futile. *See Bixler v. Foster*, 596 F.3d 751, 760 (10th Cir. 2010) ("Plaintiffs also attempt to avoid the PSLRA bar by arguing that most of their alleged predicate acts do not describe securities fraud . . . . Allowing plaintiffs to engage in 'surgical presentation of the cause of action'

would undermine the purpose of the RICO amendment."); *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007) ("Because the PSLRA bar would apply under any internally consistent set of facts, it would be futile to amend the RICO claim.").

## IV. CONCLUSION

For the reasons set out above, the court grants the defendants' motions to dismiss. The RICO claims are dismissed with prejudice. In their response, the plaintiffs requested leave to replead, noting that they might amend their complaint to allege a federal securities fraud claim. Because the court is aware of the possibility that the plaintiffs might present an alternative basis for federal jurisdiction, the court merely dismisses the remainder of the complaint without prejudice. The plaintiffs shall file an amended complaint by 8/17/2012, or the case will be dismissed.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  July 18, 2012